**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| CURITEC, LLC[1] | ) |
| | ) Case No. 23-90108 (CML) |
| Debtor. | ) |

**DECLARATION OF NICHOLAS PERCIVAL IN SUPPORT OF CHAPTER 11
PETITION AND FIRST DAY MOTIONS**

I, Nicholas Percival, declare, pursuant to § 1746 of title 28 of the United States Code, that:

1. I am the manager, 50% owner, and chief operating officer of Curitec, LLC (the "Debtor").

2. All facts set forth in this declaration are based on my personal knowledge or, where specified, based on my knowledge, information, or belief. If I were called to testify, then I would testify competently as to the facts set forth in this Declaration.

3. In my capacity as manager, owner, and chief operating officer of the Debtor, I am familiar with the Debtor's day-to-day business operations, business, and financial affairs.

4. I am authorized by the Debtor to submit this declaration in support of its chapter 11 petition and motions requesting relief to assist with the Debtor's transition into chapter 11 (the "First Day Motions").

**I.    The Debtor's Organizational Structure**

5. The Debtor was formed in 2018 as a limited liability company organized under the laws of the State of Florida. Maria Percival and I are the sole members of the Debtor and each

---

[1] The last four digits of the taxpayer identification number of Curitec, LLC are 3000. The principal office of Curitec, LLC is located at 24 Waterway Ave, Suite 755, The Woodlands, TX 77380.

1

22717895.v3

own 50% of the Debtor's membership units.  As noted, I am the manager of the Debtor.

6.       The Debtor adopted a resolution (the "Resolution") authorizing the filing of its bankruptcy petition.  A true and exact copy of the Resolution is attached as **Exhibit A**.  Pursuant to the Resolution, I am authorized to act for the Debtor in this chapter 11 case.

## II.      A Description of the Debtor's Business Operations

7.       Based out of its Texas headquarters, the Debtor provides wound management solutions to post-acute and long-term care patients (the "Patients"), who are predominantly elderly, high risk, high acuity, and fragile.  The Debtor does this by delivering wound care products as well as ostomy, urological, and tracheostomy supplies to facilities and by providing direct education to Patients and/or their caregivers.  The Debtor's goal is for Patients to receive the best possible wound care products while lowering cost for the delivery of wound care goods and services to Patients receiving health care services in long-term care, post-acute facilities, and/or hospice agencies (collectively, the "Facilities" and each a "Facility").

8.       Medicare is the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-Stage Renal Disease.  The majority of Patients are Medicare Part B beneficiaries.  Medicare Part B pays for, among other things, medically necessary durable medical equipment and other medical supplies, such as wound care supplies provided by the Debtor.  Medicare covers wound care dressings for injuries treated by a surgical procedure or after the removal of devitalized skin, tissue, and debris from the wound bed.

9.       The Debtor's Patients also include individuals who receive health benefits through Medicare managed care plans ("Managed Care Plans"), which are health plans offered by private companies that have a contract with Medicare.  Managed Care Plans provide coverage for health services in place of Medicare and may provide coverage for services that Medicare Part B does

not cover, such as routine dental care. Managed Care Plans are also referred to as Medicare Part C plans and may also include coverage for prescription drugs.

10. The Debtor employs a network of wound care clinicians who meet with each Facility's medical professionals and Patients in their communities and health care settings on a monthly basis to coordinate with the Facility's wound team to supply patient-specific products based on the most clinically appropriate products related to the recommendations from the Facility's wound team. Based on a Patient's health care needs, as identified by the Facilities' wound teams, the Debtor delivers health care products throughout the country in Patient-specific boxes within two to three business days. This ensures that supplies are delivered to the Facilities (or in the case of direct delivery to the Patient, to the Patient's door) quickly and efficiently—and to the correct Patient.

11. Based on patient-specific information, the Debtor provides each health care Facility with which it works, the information to track wound healing rates and outcomes to show the progression of the wound healing process. The Debtor's data is also used to provide direct care providers at Facilities with information on whether treatment should be adjusted based on a specific Patient's recovery progression.

12. In addition, at no direct cost to Patients, Facilities, or Medicare, the Debtor offers the following additional services: (A) Patient-specific information to track wound healing rates and outcomes to show the progression of the wound healing process; (B) comprehensive educational resources, including information regarding (i) wound etiologies, (ii) wound documentation, (iii) pressure injury prevention, and (iv) advanced wound management; and (C) detailed monthly reports on which Patients received wound supplies, how those supplies are intended to be utilized, and the frequency with which they should be used.

**III.     The Debtor's Annual Revenues and Interests in its Assets**

13.     For the Debtor's most recent fiscal year, which ended on December 31, 2022, the Debtor's annual revenue was, on a cash basis $26,926,496.90 and on an accrual basis $36,768,350.64 with 90% from Medicare Part B and 10% from Managed Care Plans. The Debtor also receives a small amount of cash receipts from state Medicaid programs for patients who are dually eligible for Medicare and Medicaid, but Medicaid receipts approximately 1% or less of total revenue.

14.     In calendar year 2022, the Debtor had approximately 30,000 encounters with Patients, representing approximately 12,100 discrete Patients receiving services at approximately 1,200 Facilities. In the aggregate, the Debtor estimates that its goods and services provided savings in health care delivery costs of approximately $22,500,000.00, based the Debtor's internal books, records, and review.

15.     The Debtor owns no real estate and only owns personal property in the form of equipment, supplies, and intangible assets, such as accounts receivable, digital electronic records, and deposit accounts.

16.     The Debtor is not aware of any party who may have an interest in some or all of the Debtor's "cash collateral" (the "Cash Collateral") as that term is used in § 363(a) of the title 11 of the United States Code (the "Bankruptcy Code"). The Debtor has reviewed its books and records and is not aware of any security agreements or other documents pledging Cash Collateral to any party.

17.     In addition, shortly before the Petition Date, the Debtor requested UCC-11 reports from the state filing offices in Texas, where the Debtor is headquartered, and Florida, under which law the Debtor is organized. There are no financing statements filed in Texas.

18. The Debtor is aware of a financing statement filed in Florida by RGH Enterprises, Inc. ("RGH"), an affiliate of Cardinal Health, with respect to all business assets, including accounts. However, the Debtor has not executed a security agreement or any document granting a security interest to RGH or any other party. Further, I personally communicated with RGH and Cardinal Health extensively in the days shortly before the Petition Date requesting documentation of any claimed security interest, and RGH and Cardinal were unable to provide such documentation.

19. Thus, I believe that the Debtor's Cash Collateral is unencumbered.

### IV. Events Leading to the Debtor's Chapter 11 Filing and Chapter 11 Exit Strategy

20. Until the days and weeks shortly before the Petition Date, the Debtor has been a profitable business, in addition to providing high-quality goods and services to Patients.

21. The Debtor's financial distress is directly attributable to an unforeseen and unexplained decision by the Centers for Medicare & Medicaid Services ("CMS") to suspend Medicare payments to the Debtor pursuant to a letter dated February 8, 2023 (the "Suspension Letter"), a copy of which is attached hereto as **Exhibit B**.

22. As set forth in the Suspension Letter, CMS made the decision to suspend payments based on what it determined are credible allegations of fraud and identified $4,760.24 of claims over a multi-month period in 2020 for which CMS alleges "[t]he documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article." *See* **Exhibit B**. The Debtor has since received notice of an audit from a recovery audit contract for Medicare to identify overpayments.

23. The Debtor has requested additional information from CMS regarding the allegations but none has been provided.

5

24. Thus, the Debtor's business has effectively been ground to a halt, delivery of health care to Patients—who are predominantly elderly, high acuity, or fragile—threatened, and employment jeopardized based on allegations of a lack of proper documentation for payments representing less than 0.00013% of the Debtor's annualized revenue. In the meantime, based on the Debtor's books and records as of the date of February 28, 2023, (A) a total of about $2 million in claims submitted to Medicare are due and owing and have not been paid; (B) there are about $2 million in submitted claims that Medicare has not yet processed; and (C) the Debtor is in the process of submitting to Medicare at least 12,049 claims for services that total about $11.5 million. These claim amounts are expected to increase as the Debtor's business continues to generate sales and accounts receivable.

25. Receipts from these claims are necessary for the Debtor's business operations—but the Debtor does not know when or if it will receive such receipts. Absent relief from this Court, Curitec is expected to run out of money in less than a month. Should that occur, Curitec will be out of business, all of its employees will lose their jobs, and 12,099 patients will lose access to life-saving products and services, including the 50% of its patients located in rural areas who may not have other readily-available treatment options. As things currently stand, Curitec has already reduced its staff by 10% to manage cash. Prior to filing bankruptcy, the Debtor sought to address the Suspension Letter directly. On February 10, 2023, the Debtor issued a Freedom of Information Act request (the "FOIA Request") for information related to the Suspension Notice. To date, the Debtor has not received any information in response to the FOIA Request.

26. On February 17, 2023, health care regulatory counsel for Curitec contacted legal counsel for Qlarant, a Unified Program Integrity Contractor ("UPIC") appointed by CMS to detect, prevent, and deter fraud and abuse in the Medicare program. I understand that Qlarant's legal

6

counsel was unable to discuss the suspension.

27. The Debtor has timely filed a rebuttal (the "Rebuttal") to the Suspension Letter on March 1, 2023.  A true and exact copy of the Rebuttal (excluding portions redacted because they include confidential patient information) is attached as **Exhibit C**. The Rebuttal addresses the allegations in the Suspension Letter and seeks to have the suspension reversed so that Medicare payments can resume.  To date, no action has been taken on the Rebuttal, and Medicare payments have not been received since the issuance of the Suspension Letter.

28. Without the ability to obtain immediate relief from CMS, the Debtor has filed this chapter 11 case in order to seek the protection of the automatic stay pending resolution of its disputes with CMS in addition to achieving other debt restructuring objectives.

29. Consequently, the Debtor anticipates that it will file a chapter 11 plan providing repayment to creditors in an amount that will be dependent upon resolution of its disputes with CMS.

## V.     Allegations in Support of the First Day Motions and Complex Case Designation

### A.     The Payroll Motion

30. The Debtor has or will file a motion seeking permission, but not requiring, the Debtor to pay pre-petition payroll and to maintain employee benefit programs (the "Payroll Motion")  I have reviewed the Payroll Motion and the allegations contained therein.  To the best of my knowledge, information, and belief, the allegations in the following paragraphs are true and accurate: 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 52.

31. I believe that any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with its employees; cause irreparable harm to

morale; and harm the value of the Debtor's business, property, and assets. The Debtor's workforce constitutes one of its most valuable assets – and material workforce attrition at this delicate time in the Debtor's life would be detrimental to preservation of value for distribution to creditors. Thus, to maintain and preserve morale of the Debtor's continuing labor force during this chapter 11 case, I believe that it is essential that the Payroll Motion be granted.

32. Absent the relief requested in the Payroll Motion, I believe that the Debtor's workforce will suffer undue hardship and, in many instances, suffer financial difficulties because their wages are needed to enable payment of personal obligations.

33. Further, I believe that members of the Debtor's workforce would seek other employment if not paid and that the Debtor could lose critical team members who would be difficult to replace. The loss of these employees would jeopardize the Debtor's continuing business operations and the ability to consummate a going concern sale as a way to de-lever the balance sheet associated with the Debtor's assets.

### B. The Cash Management Motion

34. The Debtor has or will file a motion requesting permission to maintain its pre-petition cash management system and bank account in addition to requesting certain other related forms of relief, including authorizing payment through credit or debit cards and wire transfer as well as a waiver of the requirements of section 345(b) of the Bankruptcy Code (the "Cash Management Motion"). To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Cash Management Motion are true and accurate: 6, 7, 8, 9, 10, 11, 12, 13, 17, 18, 19, 31, and 32.

35. I believe the relief requested in the Cash Management Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor. The Debtor's cash flow

is predominantly dependent upon payments from Medicare Part B and Medicare Managed Plans. It is my understanding that opening a new bank account and establishing new payment directions with Medicare, in particular, as well as Medicare Managed Plans, could lead to disruptions in payment or payments that do not ever arrive, thereby further harming the Debtor's business and ability to maintain operations.

36. I also believe that the other forms of relief requested in the Cash Management Motion are critical to the Debtor's business.

      **C.**     **Ordinary Course Professionals Motion**

37. The Debtor has or will file a motion requesting permission to employ several non-bankruptcy professionals ("Ordinary Course Professionals") who routinely provide services to the Debtor, other than representation of the Debtor in prosecution of its chapter 11 reorganization (the "Ordinary Course Professionals Motion"). To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Ordinary Course Professionals Motion are true and accurate: 6, 8, 9, 10, 18, 19, and 23.

38. The Ordinary Course Professionals are vital to the Debtor's regular business operations in addition to key aspects of this chapter 11 case. More specifically, several of the Ordinary Course Professionals are integral members of the Debtor's team of outside advisors responding to the Suspension Letter as a regulatory matter and also providing advice and input on the Debtor's strategy to obtain relief before this Court. Contemporaneous with the filing of the Debtor's voluntary petition, the Debtor has or will file a complaint and motion for temporary restraining order seeking enforcement of the automatic stay against CMS. Without assistance from the Ordinary Course Professionals, who are already familiar with the Debtor's disputes with CMS, the Debtor will be required to immediately expand the scope of services required by its chapter 11

9

attorneys, likely at greater cost and with potential delays to the Debtor's case strategy before this Court.

39. Thus, I believe the relief requested in the Ordinary Course Professionals Motion is critical to avoid immediate and irreparable harm to the Debtor.

### D. Utilities Motion

40. The Debtor has or will file a motion requesting that the Court authorize a deposit to provide adequate assurance of performance to the Debtor's internet provider (the "Utilities Motion"). To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Utilities Motion are true and accurate: 7, 8, 9, 10, 11, 12, and 24.

41. Simply put, the Debtor's business requires reliable and steady internet in order to function. Without access to the internet, the Debtor is unable to conduct virtually all aspects of its business. To the extent that the Debtor's internet provide is a utility, the Debtor would be at risk of its business operations ceasing, almost immediately, in the event that adequate assurance is not provided. Thus, I believe the relief requested in the Utilities Motion is critical to avoid immediate and irreparable harm to the Debtor

### E. The Need for Emergency or Expedited Hearings

42. Due to the nature of the relief sought by the First Day Motions, the Debtor seeks expedited or emergency hearings on them in light of the relief requested and the Court's availability, as soon as is reasonably possible after the Petition Date.

43. The Debtor seeks immediate relief with respect to the Payroll Motion. Without immediate authority to pay outstanding pre-petition payroll (subject to the limitations of the Bankruptcy Code) and to maintain employee benefit programs, the Debtor will not be able to pay its employees in an ordinary and timely manner. This would almost certainly lead to a loss of

employees at a time when the Debtor needs them most.

44. The Debtor also seeks immediate relief with respect to the Cash Management Motion, primarily to maintain its existing bank account. The Debtor must transition into chapter 11 with as little disruption as possible. Requiring the Debtor to open new bank accounts will likely lead to delays or losses of payments, which would harm the Debtor's business and its ability to pay expenses, such as payroll, in an ordinary and timely manner.

45. The Debtor seeks immediately relief with respect to the Ordinary Course Professionals Motion. The Debtor is commencing an adversary proceeding against CMS contemporaneous with the filing of its voluntary petition. Successful implementation of the Debtor's strategy requires immediate assistance of Ordinary Course Professionals who are knowledgeable about the Debtor's business and regulatory matters. Any interruption in the delivery of services from Ordinary Course Professionals threatens the Debtor's ability to implement this strategy, thereby jeopardizing the Debtor's ability to maintain business operations in the immediate short-term pending resolution of disputes with CMS on a final basis.

46. The Debtor seeks immediate relief with respect to the Utilities Motion. Without continued access to reliable internet, the Debtor will be unable to operate its business. I understand that, to the extent our internet service provider is a utility, the company could turn off our internet if adequate assurance of performance is not provided within twenty (20) calendar days of the Petition Date. This would effectively end the Debtor's business operations, a result that the Debtor wishes to avoid. For this reason, I believe emergency or expedited relief with respect to the Utilities Motion is warranted.

47. Finally, and more broadly, premature closure of the Debtor would not only harm creditors, employees, and equity, but it would also significantly injure the Facilities that rely on

the Debtor's services. It would also harm the thousands of Patients, many of whom live in rural locations or are otherwise homebound and who do not have readily available alternatives for products and services such as those delivered by the Debtor.

48. To elaborate, it is my belief, based on my experience and knowledge in the industry, that care at the Facilities would be immediately impacted due to the loss of educational services the Debtor provides to Facility personnel. Wound care is a highly specialized aspect of patient care, and most physicians and clinical staff have only basic training in wound care. The Debtor also coordinates the care and healing of wounds with Facility staff and physicians. Because Facility staff turnover is high, the need for continuous education is great, and the Debtor delivers it. Most Facilities neither stock, nor have access to, many of the advanced wound care products supplied by the Debtor. Therefore, without the Debtor, Facilities will suffer, positive Patient and wound outcomes would decrease, and the overall burden and cost to the health system would increase.

49. The Debtor also provides a valuable, direct lifeline to rural and home-bound Patients. Without the Debtor, this group of Patients will no longer have timely home delivery of Patient-specific advanced wound care products that are tailored to the needs of their specific wounds. Timely delivery of such products can literally be the difference between life and death. Many Patients receiving advanced wound care products experience reduced wound related complications in their treatment, such as infection and sepsis, both of which can lead directly to death if not regularly treated. Many Patients for which the Debtor provides education, coordination of care, and supplies or products have had chronic wounds for years that have healed due to the Debtor's products and specialized wound-related staff education. This not only benefits the individual Patients, but it also reduces the overall burden on the health system and Medicare.

50. Harm caused by premature closure to the Debtor would be further exacerbated by the fact the there are no other ready alternatives. It would likely take many weeks if not months for Patients to find a comparable alternative. In fact, there is no other company providing education and high-quality advanced wound care products like the Debtor.

[Remainder of page intentionally left blank]

I certify under penalty of perjury that the foregoing is true and correct.

Date: March 3, 2023                            _____
                                                          Nicholas Percival

22717895.v3