**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |
|---|---|
| In re: | )<br>)<br>)    Chapter 11<br>) |
| CURITEC, LLC[1] | )<br>)    Case No. 23-90108 (CML) |
|      Debtor. | )<br>) |

**DECLARATION OF NICHOLAS PERCIVAL IN SUPPORT OF CHAPTER 11**
**PETITION AND  FIRST DAY MOTIONS**

I, Nicholas Percival, declare, pursuant to § 1746 of title 28 of the United States Code, that:

1.　　I am the manager, 50% owner, and chief operating officer of Curitec, LLC (the "<u>Debtor</u>").

2.　　All facts set forth in this declaration are based on my personal knowledge or, where specified, based on my knowledge, information, or belief.  If I were called to testify, then I would testify competently as to the facts set forth in this Declaration.

3.　　In my capacity as manager, owner, and chief operating officer of the Debtor, I am familiar with the Debtor's day-to-day business operations, business, and financial affairs.

4.　　I am authorized by the Debtor to submit this declaration in support of its chapter 11 petition and motions requesting relief to assist with the Debtor's transition into chapter 11 (the "<u>First Day Motions</u>").

**I.　　The Debtor's Organizational Structure**

5.　　The Debtor was formed in 2018 as a limited liability company organized under the laws of the State of Florida.  Maria Percival and I are the sole members of the Debtor and each

---

[1] The last four digits of the taxpayer identification number of Curitec, LLC are 3000.  The principal office of Curitec, LLC is located at 24 Waterway Ave, Suite 755, The Woodlands, TX 77380.

own 50% of the Debtor's membership units. As noted, I am the manager of the Debtor.

6. The Debtor adopted a resolution (the "Resolution") authorizing the filing of its bankruptcy petition. A true and exact copy of the Resolution is attached as **Exhibit A**. Pursuant to the Resolution, I am authorized to act for the Debtor in this chapter 11 case.

**II.    A Description of the Debtor's Business Operations**

7. Based out of its Texas headquarters, the Debtor provides wound management solutions to post-acute and long-term care patients (the "Patients"), who are predominantly elderly, high risk, high acuity, and fragile. The Debtor does this by delivering wound care products as well as ostomy, urological, and tracheostomy supplies to facilities and by providing direct education to Patients and/or their caregivers. The Debtor's goal is for Patients to receive the best possible wound care products while lowering cost for the delivery of wound care goods and services to Patients receiving health care services in long-term care, post-acute facilities, and/or hospice agencies (collectively, the "Facilities" and each a "Facility").

8. Medicare is the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-Stage Renal Disease. The majority of Patients are Medicare Part B beneficiaries. Medicare Part B pays for, among other things, medically necessary durable medical equipment and other medical supplies, such as wound care supplies provided by the Debtor. Medicare covers wound care dressings for injuries treated by a surgical procedure or after the removal of devitalized skin, tissue, and debris from the wound bed.

9. The Debtor's Patients also include individuals who receive health benefits through Medicare managed care plans ("Managed Care Plans"), which are health plans offered by private companies that have a contract with Medicare. Managed Care Plans provide coverage for health services in place of Medicare and may provide coverage for services that Medicare Part B does

2

not cover, such as routine dental care. Managed Care Plans are also referred to as Medicare Part C plans and may also include coverage for prescription drugs.

10.     The Debtor employs a network of wound care clinicians who meet with each Facility's medical professionals and Patients in their communities and health care settings on a monthly basis to coordinate with the Facility's wound team to supply patient-specific products based on the most clinically appropriate products related to the recommendations from the Facility's wound team. Based on a Patient's health care needs, as identified by the Facilities' wound teams, the Debtor delivers health care products throughout the country in Patient-specific boxes within two to three business days. This ensures that supplies are delivered to the Facilities (or in the case of direct delivery to the Patient, to the Patient's door) quickly and efficiently—and to the correct Patient.

11.     Based on patient-specific information, the Debtor provides each health care Facility with which it works, the information to track wound healing rates and outcomes to show the progression of the wound healing process. The Debtor's data is also used to provide direct care providers at Facilities with information on whether treatment should be adjusted based on a specific Patient's recovery progression.

12.     In addition, at no direct cost to Patients, Facilities, or Medicare, the Debtor offers the following additional services: (A) Patient-specific information to track wound healing rates and outcomes to show the progression of the wound healing process; (B) comprehensive educational resources, including information regarding (i) wound etiologies, (ii) wound documentation, (iii) pressure injury prevention, and (iv) advanced wound management; and (C) detailed monthly reports on which Patients received wound supplies, how those supplies are intended to be utilized, and the frequency with which they should be used.

3

III.    **The Debtor's Annual Revenues and Interests in its Assets**

13.    For the Debtor's most recent fiscal year, which ended on December 31, 2022, the Debtor's annual revenue was, on a cash basis $26,926,496.90 and on an accrual basis $36,768,350.64 with 90% from Medicare Part B and 10% from Managed Care Plans. The Debtor also receives a small amount of cash receipts from state Medicaid programs for patients who are dually eligible for Medicare and Medicaid, but Medicaid receipts approximately 1% or less of total revenue.

14.    In calendar year 2022, the Debtor had approximately 30,000 encounters with Patients, representing approximately 12,100 discrete Patients receiving services at approximately 1,200 Facilities. In the aggregate, the Debtor estimates that its goods and services provided savings in health care delivery costs of approximately $22,500,000.00, based the Debtor's internal books, records, and review.

15.    The Debtor owns no real estate and only owns personal property in the form of equipment, supplies, and intangible assets, such as accounts receivable, digital electronic records, and deposit accounts.

16.    The Debtor is not aware of any party who may have an interest in some or all of the Debtor's "cash collateral" (the "Cash Collateral") as that term is used in § 363(a) of the title 11 of the United States Code (the "Bankruptcy Code"). The Debtor has reviewed its books and records and is not aware of any security agreements or other documents pledging Cash Collateral to any party.

17.    In addition, shortly before the Petition Date, the Debtor requested UCC-11 reports from the state filing offices in Texas, where the Debtor is headquartered, and Florida, under which law the Debtor is organized. There are no financing statements filed in Texas.

4

18. The Debtor is aware of a financing statement filed in Florida by RGH Enterprises, Inc. ("RGH"), an affiliate of Cardinal Health, with respect to all business assets, including accounts. However, the Debtor has not executed a security agreement or any document granting a security interest to RGH or any other party. Further, I personally communicated with RGH and Cardinal Health extensively in the days shortly before the Petition Date requesting documentation of any claimed security interest, and RGH and Cardinal were unable to provide such documentation.

19. Thus, I believe that the Debtor's Cash Collateral is unencumbered.

## IV. Events Leading to the Debtor's Chapter 11 Filing and Chapter 11 Exit Strategy

20. Until the days and weeks shortly before the Petition Date, the Debtor has been a profitable business, in addition to providing high-quality goods and services to Patients.

21. The Debtor's financial distress is directly attributable to an unforeseen and unexplained decision by the Centers for Medicare & Medicaid Services ("CMS") to suspend Medicare payments to the Debtor pursuant to a letter dated February 8, 2023 (the "Suspension Letter"), a copy of which is attached hereto as **Exhibit B**.

22. As set forth in the Suspension Letter, CMS made the decision to suspend payments based on what it determined are credible allegations of fraud and identified $4,760.24 of claims over a multi-month period in 2020 for which CMS alleges "[t]he documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article." *See* **Exhibit B**. The Debtor has since received notice of an audit from a recovery audit contract for Medicare to identify overpayments.

23. The Debtor has requested additional information from CMS regarding the allegations but none has been provided.

5

24.     Thus, the Debtor's business has effectively been ground to a halt, delivery of health care to Patients—who are predominantly elderly, high acuity, or fragile—threatened, and employment jeopardized based on allegations of a lack of proper documentation for payments representing less than 0.00013% of the Debtor's annualized revenue.  In the meantime, based on the Debtor's books and records as of the date of February 28, 2023, (A) a total of about $2 million in claims submitted to Medicare are due and owing and have not been paid; (B) there are about $2 million  in submitted claims that Medicare has not yet processed; and (C) the Debtor is in the process of submitting to Medicare at least 12,049 claims for services that total about $11.5 million. These claim amounts are expected to increase as the Debtor's business continues to generate sales and accounts receivable.

25.     Receipts from these claims are necessary for the Debtor's business operations—but the Debtor does not know when or if it will receive such receipts.  Absent relief from this Court, Curitec is expected to run out of money in less than a month.  Should that occur, Curitec will be out of business, all of its employees will lose their jobs, and 12,099 patients will lose access to life-saving products and services, including the 50% of its patients located in rural areas who may not have other readily-available treatment options.  As things currently stand, Curitec has already reduced its staff by 10% to manage cash.  Prior to filing bankruptcy, the Debtor sought to address the Suspension Letter directly.  On February 10, 2023, the Debtor issued a Freedom of Information Act request (the "FOIA Request") for information related to the Suspension Notice.  To date, the Debtor has not received any information in response to the FOIA Request.

26.     On February 17, 2023, health care regulatory counsel for Curitec contacted legal counsel for Qlarant, a Unified Program Integrity Contractor ("UPIC") appointed by CMS to detect, prevent, and deter fraud and abuse in the Medicare program.  I understand that Qlarant's legal

counsel was unable to discuss the suspension.

27.     The Debtor has timely filed a rebuttal (the "<u>Rebuttal</u>") to the Suspension Letter on March 1, 2023.   A true and exact copy of the Rebuttal (excluding portions redacted because they include confidential patient information) is attached as **<u>Exhibit C</u>**. The Rebuttal addresses the allegations in the Suspension Letter and seeks to have the suspension reversed so that Medicare payments can resume.  To date, no action has been taken on the Rebuttal, and Medicare payments have not been received since the issuance of the Suspension Letter.

28.     Without the ability to obtain immediate relief from CMS, the Debtor has filed this chapter 11 case in order to seek the protection of the automatic stay pending resolution of its disputes with CMS in addition to achieving other debt restructuring objectives.

29.     Consequently, the Debtor anticipates that it will file a chapter 11 plan providing repayment to creditors in an amount that will be dependent upon resolution of its disputes with CMS.

## V.     <u>Allegations in Support of the First Day Motions and Complex Case Designation</u>

### A.     <u>The Payroll Motion</u>

30.     The Debtor has or will file a motion seeking permission, but not requiring, the Debtor to pay pre-petition payroll and to maintain employee benefit programs (the "<u>Payroll Motion</u>")  I have reviewed the Payroll Motion and the allegations contained therein.  To the best of my knowledge, information, and belief, the allegations in the following paragraphs are true and accurate: 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, and 52.

31.     I believe that any delay in paying compensation and contributions to employee benefit programs will damage the Debtor's relations with its employees; cause irreparable harm to

morale; and harm the value of the Debtor's business, property, and assets. The Debtor's workforce constitutes one of its most valuable assets – and material workforce attrition at this delicate time in the Debtor's life would be detrimental to preservation of value for distribution to creditors. Thus, to maintain and preserve morale of the Debtor's continuing labor force during this chapter 11 case, I believe that it is essential that the Payroll Motion be granted.

32.     Absent the relief requested in the Payroll Motion, I believe that the Debtor's workforce will suffer undue hardship and, in many instances, suffer financial difficulties because their wages are needed to enable payment of personal obligations.

33.     Further, I believe that members of the Debtor's workforce would seek other employment if not paid and that the Debtor could lose critical team members who would be difficult to replace. The loss of these employees would jeopardize the Debtor's continuing business operations and the ability to consummate a going concern sale as a way to de-lever the balance sheet associated with the Debtor's assets.

### B.     The Cash Management Motion

34.     The Debtor has or will file a motion requesting permission to maintain its pre-petition cash management system and bank account in addition to requesting certain other related forms of relief, including authorizing payment through credit or debit cards and wire transfer as well as a waiver of the requirements of section 345(b) of the Bankruptcy Code (the "Cash Management Motion"). To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Cash Management Motion are true and accurate: 6, 7, 8, 9, 10, 11, 12, 13, 17, 18, 19, 31, and 32.

35.     I believe the relief requested in the Cash Management Motion is critical to avoid disruption to the Debtor's operations and irreparable harm to the Debtor. The Debtor's cash flow

is predominantly dependent upon payments from Medicare Part B and Medicare Managed Plans. It is my understanding that opening a new bank account and establishing new payment directions with Medicare, in particular, as well as Medicare Managed Plans, could lead to disruptions in payment or payments that do not ever arrive, thereby further harming the Debtor's business and ability to maintain operations.

36.     I also believe that the other forms of relief requested in the Cash Management Motion are critical to the Debtor's business.

## C.     Ordinary Course Professionals Motion

37.     The Debtor has or will file a motion requesting permission to employ several non-bankruptcy professionals ("Ordinary Course Professionals") who routinely provide services to the Debtor, other than representation of the Debtor in prosecution of its chapter 11 reorganization (the "Ordinary Course Professionals Motion").  To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Ordinary Course Professionals Motion are true and accurate: 6, 8, 9, 10, 18, 19, and 23.

38.     The Ordinary Course Professionals are vital to the Debtor's regular business operations in addition to key aspects of this chapter 11 case.  More specifically, several of the Ordinary Course Professionals are integral members of the Debtor's team of outside advisors responding to the Suspension Letter as a regulatory matter and also providing advice and input on the Debtor's strategy to obtain relief before this Court.  Contemporaneous with the filing of the Debtor's voluntary petition, the Debtor has or will file a complaint and motion for temporary restraining order seeking enforcement of the automatic stay against CMS.  Without assistance from the Ordinary Course Professionals, who are already familiar with the Debtor's disputes with CMS, the Debtor will be required to immediately expand the scope of services required by its chapter 11

9

attorneys, likely at greater cost and with potential delays to the Debtor's case strategy before this Court.

39.     Thus, I believe the relief requested in the Ordinary Course Professionals Motion is critical to avoid immediate and irreparable harm to the Debtor.

**D.      Utilities Motion**

40.     The Debtor has or will file a motion requesting that the Court authorize a deposit to provide adequate assurance of performance to the Debtor's internet provider (the "Utilities Motion").  To the best of my knowledge, information, and belief, the allegations in the following paragraphs of the Utilities Motion are true and accurate: 7, 8, 9, 10, 11, 12, and 24.

41.     Simply put, the Debtor's business requires reliable and steady internet in order to function.  Without access to the internet, the Debtor is unable to conduct virtually all aspects of its business.  To the extent that the Debtor's internet provide is a utility, the Debtor would be at risk of its business operations ceasing, almost immediately, in the event that adequate assurance is not provided.  Thus, I believe the relief requested in the Utilities Motion is critical to avoid immediate and irreparable harm to the Debtor

**E.      The Need for Emergency or Expedited Hearings**

42.     Due to the nature of the relief sought by the First Day Motions, the Debtor seeks expedited or emergency hearings on them in light of the relief requested and the Court's availability, as soon as is reasonably possible after the Petition Date.

43.     The Debtor seeks immediate relief with respect to the Payroll Motion.  Without immediate authority to pay outstanding pre-petition payroll (subject to the limitations of the Bankruptcy Code) and to maintain employee benefit programs, the Debtor will not be able to pay its employees in an ordinary and timely manner.  This would almost certainly lead to a loss of

employees at a time when the Debtor needs them most.

44.     The Debtor also seeks immediate relief with respect to the Cash Management Motion, primarily to maintain its existing bank account.  The Debtor must transition into chapter 11 with as little disruption as possible.  Requiring the Debtor to open new bank accounts will likely lead to delays or losses of payments, which would harm the Debtor's business and its ability to pay expenses, such as payroll, in an ordinary and timely manner.

45.     The Debtor seeks immediately relief with respect to the Ordinary Course Professionals Motion.  The Debtor is commencing an adversary proceeding against CMS contemporaneous with the filing of its voluntary petition.  Successful implementation of the Debtor's strategy requires immediate assistance of Ordinary Course Professionals who are knowledgeable about the Debtor's business and regulatory matters.  Any interruption in the delivery of services from Ordinary Course Professionals threatens the Debtor's ability to implement this strategy, thereby jeopardizing the Debtor's ability to maintain business operations in the immediate short-term pending resolution of disputes with CMS on a final basis.

46.     The Debtor seeks immediate relief with respect to the Utilities Motion.  Without continued access to reliable internet, the Debtor will be unable to operate its business.  I understand that, to the extent our internet service provider is a utility, the company could turn off our internet if adequate assurance of performance is not provided within twenty (20) calendar days of the Petition Date.  This would effectively end the Debtor's business operations, a result that the Debtor wishes to avoid.  For this reason, I believe emergency or expedited relief with respect to the Utilities Motion is warranted.

47.     Finally, and more broadly, premature closure of the Debtor would not only harm creditors, employees, and equity, but it would also significantly injure the Facilities that rely on

22717895.v3

the Debtor's services. It would also harm the thousands of Patients, many of whom live in rural locations or are otherwise homebound and who do not have readily available alternatives for products and services such as those delivered by the Debtor.

48. To elaborate, it is my belief, based on my experience and knowledge in the industry, that care at the Facilities would be immediately impacted due to the loss of educational services the Debtor provides to Facility personnel. Wound care is a highly specialized aspect of patient care, and most physicians and clinical staff have only basic training in wound care. The Debtor also coordinates the care and healing of wounds with Facility staff and physicians. Because Facility staff turnover is high, the need for continuous education is great, and the Debtor delivers it. Most Facilities neither stock, nor have access to, many of the advanced wound care products supplied by the Debtor. Therefore, without the Debtor, Facilities will suffer, positive Patient and wound outcomes would decrease, and the overall burden and cost to the health system would increase.

49. The Debtor also provides a valuable, direct lifeline to rural and home-bound Patients. Without the Debtor, this group of Patients will no longer have timely home delivery of Patient-specific advanced wound care products that are tailored to the needs of their specific wounds. Timely delivery of such products can literally be the difference between life and death. Many Patients receiving advanced wound care products experience reduced wound related complications in their treatment, such as infection and sepsis, both of which can lead directly to death if not regularly treated. Many Patients for which the Debtor provides education, coordination of care, and supplies or products have had chronic wounds for years that have healed due to the Debtor's products and specialized wound-related staff education. This not only benefits the individual Patients, but it also reduces the overall burden on the health system and Medicare.

50.     Harm caused by premature closure to the Debtor would be further exacerbated by the fact the there are no other ready alternatives.  It would likely take many weeks if not months for Patients to find a comparable alternative.  In fact, there is no other company providing education and high-quality advanced wound care products like the Debtor.


[Remainder of page intentionally left blank]

13

I certify under penalty of perjury that the foregoing is true and correct.

Date: March 3, 2023

_____

Nicholas Percival

# **EXHIBIT A**

(Resolutions)

# UNANIMOUS WRITTEN CONSENT OF
## MEMBERS AND MANAGER OF CURITEC, LLC

The undersigned, constituting all of the members (the "Members") and the manager (the "Manager") of Curitec, LLC, a Florida limited liability company (the "Company"), and in accordance with that certain Operating Agreement of Curitec, LLC dated October 16, 2018 (as the same may have been or may be amended from time to time) (the "Operating Agreement"), and with all Members and the Manager consenting to the actions being taken herein without a meeting, hereby consent to, approve, and adopt the following resolutions by unanimous written consent:

**WHEREAS:**  The Members and Manager have reviewed and evaluated: the financial and operating condition and prospects of the Company, the Company's assets, and the Company's current and long-term liabilities; the suspension of payments from Medicare and the consequences of the same upon the Company, its finances, its creditors, and other parties; and the possibility of seeking relief under the provisions of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), including the provisions of subchapter V of chapter 11 of the Bankruptcy Code, to pursue relief available under the Bankruptcy Code, including reorganization;

**RESOLVED:**  That the Members and Manager have determined, in the good-faith exercise of their reasonable business judgment, that it is desirable and in the best interests of the Company and its creditors and other interested parties that the Company file a voluntary petition seeking relief under the provisions of chapter 11 of the Bankruptcy Code, including, to the extent applicable, the provisions of subchapter V of chapter 11 of the Bankruptcy Code; and further

**RESOLVED:**  That the Authorized Person (defined below) be and hereby is authorized and empowered, on behalf of, and in the name of, the Company to execute and verify or certify a petition under chapter 11 of the Bankruptcy Code, including as a small business debtor under subchapter V of chapter 11 of the Bankruptcy Code, and to cause the same to be filed in the United States Bankruptcy Court for the Southern District of Texas or any other appropriate bankruptcy court (the "Bankruptcy Court") at such time as the Authorized Person shall determine; and further,

**RESOLVED:**  That the Members and the Manager reaffirm the provisions of the Operating Agreement making Nicholas Percival the Manager and, as Manager and chief operating officer of the Company, Mr. Percival (the "Authorized Person") be and hereby is authorized on behalf of, and in the name of, the Company, to execute and file any and all petitions, schedules, motions, lists, applications, pleadings, debtor-in-possession loan documents, sale transaction documents, and other similar papers, and to take any and all such other and further actions which the Company or its legal counsel may deem necessary or appropriate to file the voluntary petition for relief under

chapter 11, and to take and perform any and all further acts and deeds that the Authorized Person deems necessary, proper, and desirable in connection with a chapter 11 case of the Company, with a view to the successful prosecution of such case, including, without limitation, seeking authority to borrow under a pre- or post-petition credit facility, to grant liens and other security therefor, seeking authority to sell all or substantially all of the Company's assets, retaining professionals in the chapter 11 case, preparing and executing necessary documentation and reporting, and filing and prosecuting a plan as provided for under chapter 11 of the Bankruptcy Code; and further,

**RESOLVED:** That the Authorized Person be and hereby is authorized and directed to take such actions and to make, sign, execute, acknowledge, and deliver (and record in a relevant office, if necessary) any and all such documents listed above (including any and all affidavits, orders, directions, certificates, request, receipts, financing statements, or other instruments as may reasonably be required to give effect to these resolutions, and to execute and deliver such agreements (including exhibits thereto) and related documents, and to fully perform the terms and provisions thereof; and further,

**RESOLVED:** That the Authorized Person be and hereby is authorized and directed, on behalf of, and in the name of, the Company, to retain the law firm of Dentons, including Dentons US LLP and Dentons Bingham Greenebaum LLP, as general bankruptcy counsel to the Company in connection with the chapter 11 case (and to retain any additional specialized counsel as necessary), if the Authorized Person determines that filing of a voluntary petition for relief is proper, to represent and assist the Company in carrying out its duties under the Bankruptcy Code, and to pay Dentons (and other retained counsel) at its standard hourly rates in connection with its representation of the Company, and to provide Dentons (and other retained counsel) with a retainer in an amount to be agreed upon by Dentons (and other retained counsel, if appropriate) and the Company, with such retainer to be held as security for payment of fees and expenses in the chapter 11 case, and to reimburse Dentons (and other retained counsel, if appropriate) for any actual expenses incurred in connection with its employment by the Company; and further,

**RESOLVED:** That the Authorized Person be and hereby is authorized and directed, on behalf of, and in the name of, the Company, to retain the advisory firm of Ankura Consulting Group, LLC ("Ankura"), as financial advisor in connection with the chapter 11 case, if the Authorized Person determines that filing of a voluntary petition for relief is proper, and to pay Ankura at its standard hourly rates in connection with its representation of the Company, and to provide Ankura with a retainer in an amount to be agreed upon by Ankura and the Company, with such retainer to be held as security

for payment of fees and expenses in the chapter 11 case, and to reimburse Ankura for any actual expenses incurred in connection with its employment by the Company; and further,

**RESOLVED:**    That the Authorized Person be and hereby is authorized and directed, on behalf of, and in the name of, the Company, to retain and engage all assistance by legal counsel, accountants, investment banking advisors, financial advisors, and other professionals, subject to approval of the Bankruptcy Court, to perform any and all further acts and deeds that the Authorized Person deems necessary, proper, advisable, or desirable in furtherance thereof with a view to the successful prosecution of the Company's chapter 11 case; and further,

**RESOLVED:**    That all of the acts and transactions relating to matters contemplated by the foregoing resolutions of the Authorized Person, the Company's Members and Manager, or their respective designees, in the name and on behalf of the Company, which acts would have been approved by the foregoing resolutions except that such acts were taken prior to the execution of these resolutions, are hereby in all respects confirmed, approved, and ratified.


[Remainder of page intentionally left blank]

**MEMBERS AND MANAGER OF CURITEC, LLC:**

Date: 03/01/2023

_____
Nicholas Percival in his capacity as Member

Date: 03/01/2023

_____
Maria Percival in her capacity as Member

Date: 03/01/2023

_____
Nicholas Percival in his capacity as Manager

# **EXHIBIT B**

(Suspension Letter)



CENTERS FOR MEDICARE & MEDICAID SERVICES

Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

February 8, 2023

Curitec, LLC, dba Curitec HQ
24 Waterway Avenue, Ste. 755
The Woodlands, Texas 77380

Re:  **Notice of Suspension of Medicare Payments**
     **Provider/Supplier Medicare ID Number(s):** ██████████
     **Provider/Supplier NPI:** ████████
     **Record Identifier:** ████████████

Dear Curitec, LLC, dba Curitec HQ:

The purpose of this letter is to notify you of our determination to suspend your Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). The suspension of your Medicare payments took effect on February 7, 2023. Prior notice of this suspension was not provided, because giving prior notice would place additional Medicare funds at risk and hinder our ability to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3)and (4).

The Centers for Medicare & Medicaid Services (CMS) through its Central Office made the decision to suspend your Medicare payments. *See* 42 C.F.R. § 405.372(a)(4)(iii). This suspension is based on credible allegations of fraud. *See* 42 C.F.R. § 405.371(a)(2). CMS regulations define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. *See* 42 C.F.R. § 405.370(a). Allegations are considered credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. This suspension may last until resolution of the investigation as defined under 42 C.F.R. § 405.370 and may be extended under certain circumstances. *See* 42 C.F.R. § 405.372(d)(3)

Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, Curitec HQ billed for services that were not rendered or not rendered as billed, and captive audience billing (rendering supplies to beneficiaries in the same location such as a nursing facility). The following list of sample claims provide evidence of our findings and serve as a basis for the determination to suspend your Medicare payments:

| Claim Control Number (CCN) | Basis for Selected Claims | Date(s) of Service | Amount Paid |
|---|---|---|---|
| ████████0000 | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 12/21/2020 | $817.19 |
| ████████0000 | The documentation did not support that the | 01/22/2020 | $427.87 |

**Qlarant** 14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

| | | wounds met the criteria for a qualifying wound as per Local Coverage Article. | | |
|---|---|---|---|---|
| ███████6000 | | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 02/12/2020 | $651.08 |
| ███████0000 | | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 01/03/2020 | $2,167.96 |
| ███████7000 | | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 04/24/2020 | $696.14 |

This list is not exhaustive or complete in any sense, as the investigation into this matter is continuing. The information is provided by way of example in order to furnish you with adequate notice of the basis for this payment suspension noticed herein.

Pursuant to 42 C.F.R. § 405.372(b)(2), you have the right to submit a rebuttal statement in writing to us indicating why you believe the suspension should be removed. If you opt to do so, we request that you submit this rebuttal statement to us within 15 days of receipt of this notice, and you may include with this statement any evidence you believe supports your reasons why the suspension should be removed. If you choose to submit a rebuttal statement, your rebuttal statement and any pertinent evidence should be sent to:

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

If you submit a rebuttal statement, we will review that statement (and any supporting documentation) along with other materials associated with the case. Based on a careful review of the information you submit and all other relevant information known to us, we will determine whether the suspension should be removed, or should remain in effect within 15 days of receipt of the complete rebuttal package, consistent with 42 C.F.R. § 405.375. However, the suspension of your Medicare funds will continue while your rebuttal package is being reviewed. *See* 42 C.F.R. § 405.375(a). Thereafter, we will notify you in writing of our determination to continue or remove the suspension and provide specific findings on the conditions upon which the suspension may be continued or removed, as well as an explanatory statement of the determination. *See* 42 C.F.R. § 405.375(b)(2). This determination is not an initial determination and is not appealable. *See* 42 C.F.R. § 405.375(c).

If the suspension is continued, we will review additional evidence during the suspension period to determine whether claims are payable and/or whether an overpayment exists and, if so, the amount of the overpayment. *See* 42 C.F.R. § 405.372(c). We may need to contact you with specific requests for further information. You will be informed of developments and will be promptly notified of any overpayment determination(s). Claims will continue to be processed during the suspension period, and



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

you will be notified about bill/claim determinations, including appeal rights regarding any bills/claims that are denied. The payment suspension also applies to claims in process.

In the event that an overpayment is determined and it is determined that a recoupment of payments under 42 C.F.R. § 405.371(a)(3) should be put into effect, you will receive a separate written notice of the intention to recoup and the reasons. Please be advised that CMS may charge interest on the amount of the overpayment, consistent with 42 C.F.R. § 405.378. In the written notice alerting you to the overpayment, you will be given an opportunity for rebuttal in accordance with 42 C.F.R. § 405.374 from CGS Administrators. When the payment suspension has been removed, any money withheld as a result of the payment suspension shall be applied first to reduce or eliminate any determined overpayment by CMS or the Medicare Administrative Contractor (MAC) including any interest assessed under 42 C.F.R. § 405.378, and then to reduce any other obligation to CMS or to the U.S. Department of Health and Human Services (HHS) in accordance with 42 C.F.R. § 405.372(e). In the absence of a legal requirement that the excess be paid to another entity, the excess will be released to you.

Finally, Qlarant, a CMS Unified Program Integrity Contractor (UPIC), has initiated a process to review your Medicare claims and supporting documentation prior to payment. The purpose of implementing this prepayment process is to ensure that all payments made by the Medicare program are appropriate and consistent with Medicare rules, regulations and policy. The prepayment process is often applied to safeguard Medicare from unnecessary expenditures and to ensure that Medicare payments are made for items and services which are "reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). Notification is hereby given that you are expected to comply with the prepayment process for claims for all dates and services.

Should you have any questions regarding the status of the suspension, please direct your inquiry to **ProviderSuspensionSW@Qlarant.com**. Any request to remove the suspension must be submitted through the rebuttal process described above.

Sincerely,

UPIC South Western Administration
Qlarant Integrity Solutions, LLC

cc: Centers for Medicare & Medicaid Services



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**EXHIBIT C**

**(Rebuttal Letter - first 20 pages with balance redacted)**



CONTACT
Ashley H. Morgan

TELEPHONE
(202) 298-8750

FACSIMILE
(210) 745-4645

E-MAIL
amorgan@lilesparker.com

March 1, 2023

<u>VIA FEDERAL EXPRESS AND EMAIL</u>
**No. 7714 4800 3978**

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

| | |
|---|---|
| **Re:** | **Rebuttal Statement – Notice of Suspension** |
| **Provider:** | **Curitec, LLC d/b/a Curitec HQ** |
| **Medicare ID:** | ▮▮▮▮▮▮ |
| **NPI:** | ▮▮▮▮▮▮ |
| **Reference:** | ▮▮▮▮▮▮▮▮ |

To Whom it May Concern:

Our law firm, Liles Parker PLLC, represents Curitec, LLC, doing business as Curitec HQ (Curitec HQ) in connection with a suspension of Medicare payments imposed by Qlarant Integrity Solutions, LLC (Qlarant), a Unified Program Integrity Contractor (UPIC) working on behalf of the Centers for Medicare and Medicaid Services (CMS). An Appointment of Representative form is enclosed for your files. **Attachment A**. Curitec HQ received a Notice of Suspension from Qlarant dated February 8, 2023. **Attachment B**. Curitec HQ received an extension to respond to this Notice of Suspension, making the new deadline to submit a rebuttal statement March 9, 2023. **Attachment C**. This correspondence and the associated attachments constitute Curitec HQ's timely rebuttal statement.

## I.    Background:

Qlarant suspended Curitec HQ's Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2) effective February 7, 2023, based on *"credible allegations of fraud[,]"* specifically, *"that [Curitec HQ] misrepresented services billed to the Medicare program. More particularly, Curitec HQ billed for services that were not rendered or not rendered as billed, and captive audience billing (rendering supplies to beneficiaries in the same location such as a nursing facility)."* **Attachment B, p. 1**. In support, Qlarant provided five sample claims as evidence of its findings. Curitec HQ immediately thereafter initiated an internal investigation of the five sample

Rebuttal Statement
March 1, 2023
Page 2 of 8

claims provided, and respectfully disagrees with Qlarant's position as described below. Curitec HQ reserves the right to supplement this rebuttal statement.

## II.    Rebuttal to Qlarant's Notice of Suspension:

### A.    Sources for credible allegations of fraud were not provided by Qlarant.

As set out in Qlarant's February 8th letter **(Attachment B)**, sources of credible allegations of fraud may include fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. Qlarant has not provided the underlying data or the complete medical review results. We requested this information through a Freedom of Information Act (FOIA) on February 10, 2023, and hereby reiterate our request for prompt disclosure.

### B.    Response to Specific Claims Discussed in Suspension Notice

In each of the five sample claims cited, Qlarant alleges, *"The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article."* **Attachment B at 1-2.** Curitec HQ reviewed the five samples provided by Qlarant and strongly disagrees with the allegations of fraud. Curitec HQ contends that the items were, in fact, medically necessary and appropriate. Finally, Curitec HQ disputes Qlarant's claims that the wounds at issue did not meet the criteria to qualify for coverage and payment.

### 1.    The Claims at Issue Were During the Height of the COVID-19 Pandemic.

As an initial matter, the time period at issue took place during the COVID-19 outbreak and pandemic, **(Attachment D, p. 7)**[1] during which, in addition to the great uncertainty for health care providers and suppliers, CMS was constantly revising waivers and coverage requirements for services rendered to Medicare beneficiaries. Further, there was an increased demand for medical care and a shortage of health care providers as a result of lockdowns, mandated quarantines, and illness. The increased demands and shortages across all industries resulted in supply chain shortages for many items. Nevertheless, Curitec HQ remained focused on delivering necessary DMEPOS items and meeting the challenges of healthcare transformation as implemented by CMS during this time-period in many underserved communities.

### 2.    Previous TPE Results Demonstrate that Curitec HQ's Documentation was Sufficient to Support the Services Rendered.

The purpose of TPE is to decrease provider burden, reduce appeals, and improve the medical review/education process. Medicare Program Integrity Manual Ch. 3 Sec. 3.2.5.  Curitec HQ successfully concluded two separate 2022 Targeted Probe and Educate (TPE) reviews in Region C. **Attachment E, 1-15.** Notably, the earlier TPE probed one of the Healthcare Common Procedure Coding System (HCPCS) Codes at issue in this suspension (A6199). **Attachment E,**

---

[1] The dates of service reviewed by Qlarant range from January – December 2020. A majority of these dates of service fall after March 2020, with many during COVID-19 spikes such as in July, September, October, November and December 2020.

**p. 1**. Curitec HQ's error rate was low enough that it exited the TPE process for A6199 in the first round. **Attachment E, p. 5**. For the latter code (A6197), Curitec HQ satisfactory concluded the TPE process following the second round. **Attachment E, p. 10, 13**.

Additionally, Curitec HQ utilized the post-probe conference call procedure for both TPEs to ensure that it achieved enhanced medical necessity compliance, **(Attachment E, p. 1-15)** and conducted an in-depth review of the Local Coverage Determination (LCD) and Local Coverage Article (LCA).

Curitec HQ also recently exited TPE in Region A[2] **(Attachment E, p. 16-26)** which probed two codes at issue in the suspension, A6196 and A6212, as well A6197. Here again, Curitec HQ's error rate was low enough (17.06%) that it exited the process in the first round. **Attachment E, p. 20**.

Currently, Curitec HQ is in the first round of TPE in Region B for HCPCS A6196 and A6021 (which, again are both at issue in the suspension). **Attachment E, p. 29-36**. Curitec HQ has been submitting documentation in response to CGS's Additional Documentation Requests (ADRs) and is confident that it will successfully exit TPE in Region B after the first round.

### 3. Curitec HQ's Documentation Met the Requirements for Coverage and Payment and the Underlying Wounds Met the Criteria for Qualifying Wounds.

There are eight HCPCS codes associated with the five sample claims cited in the suspension letter. Each code relates to surgical dressings, and CGS has issued guidance on these supplies through LCD L33831. Whether these surgical dressings were reasonable and necessary is based on the following criteria:

- A4452 (Tape). Tape is covered when needed to hold on a wound cover, elastic roll gauze or non-elastic roll gauze. Tape change is determined by the frequency of change of the wound cover. Quantities of tape submitted must reasonably reflect the size of the wound cover being secured. Utilization per dressing change for wound covers measuring: (a) 16 square inches or less is up to 2 units; (b) 16 to 48 square inches, up to 3 units; and (c) greater than 48 square inches, up to 4 units.

- A6010 and A6021 (Collagen Dressing or Wound Filling). A collagen-based dressing or wound filler is covered for full thickness wounds (e.g., stage 3 or 4 ulcers), wounds with light to moderate exudate, or wounds that have stalled or have not progressed toward a healing goal.

- A6196 and A6199 (Alginate or Other Fiber Gelling Dressing). Alginate or other fiber gelling dressing covers are covered for moderately to highly exudative full thickness wounds (e.g., stage 3 or 4 ulcers); and alginate or other fiber gelling dressing fillers for moderately to highly exudative full thickness wound cavities (e.g., stage 3 or 4 ulcers). Dressing change is up to once per day. One wound cover sheet of the approximate size of the wound or up to 2 units of wound filler (1 unit = 6 inches of alginate or other fiber gelling dressing rope) is used at each dressing change.

---

[2] Noridian Healthcare Solutions is the Region A MAC.

- <u>A6209, A6212, and A6219 (Foam Dressing or Wound Filler)</u>. Foam dressings are covered when used on full thickness wounds (e.g., stage 3 or 4 ulcers) with moderate to heavy exudate. Dressing change for a foam wound cover used as a primary dressing is up to 3 times per week. When a foam wound cover is used as a secondary dressing for wounds with very heavy exudate, dressing change is up to 3 times per week. Dressing change frequency for foam wound fillers is up to once per day.

Beyond the reasonable and necessary requirements, each claim must also include proper documentation. CGS elaborates on documentation requirements by way of LCA A55426. For the five sample claims at issue in this suspension, the required documentation must include: (1) a standard written order (SWO) / prescription and (2) proof of delivery.[3]

A SWO must contain all of the following elements:

(1) beneficiary's name or Medicare Beneficiary Identifier (MBI);
(2) order date;
(3) general description of the item;
(4) quantity to be dispensed, if applicable;
(5) treating practitioner's name or National Provider Identifier (NPI); and
(6) treating practitioner's signature.[4]

There are three acceptable methods of delivery: (1) delivery directly to the beneficiary or authorized representative, (2) delivery via shipping or delivery service; and (3) delivery of items to a nursing facility on behalf of the beneficiary.[5]

Finally, CGS has provided guidance on qualifying wounds by way of LCA A54563. This Article defines a qualifying wound as either of the following:

- A wound caused by, or treated by, a surgical procedure; or,
- After debridement of the wound, regardless of the debridement technique.

The surgical procedure or debridement must be performed by a treating practitioner or other healthcare professional to the extent permissible under state law. Debridement of a wound may be any type of debridement (examples given are not all-inclusive):

- Surgical (e.g., sharp instrument or laser).
- Mechanical (e.g., irrigation or wet-to-dry dressings).
- Chemical (e.g., topical application of enzymes) or
- Autolytic (e.g., application of occlusive dressings to an open wound).[6]

---

[3] Other documentation, such as a written order prior to delivery, face-to-face encounter, and a continued medical need, among other items, are not necessary for the claims at issue here. *See* LCA A55426.
[4] *See* LCA A55426.
[5] *See* LCA A55426.
[6] *See* LCA A54563.

**Liles Parker PLLC ● 2121 Wisconsin Ave. NW ● Suite 200 ● Washington, DC 20007**

Rebuttal Statement
March 1, 2023
Page 5 of 8

As set out below, each of the items in the claims identified by Qlarant met the outlined requirements in the LCD and LCAs.

**Claim No. ████████0000**

On ███████████, Stephanie McCain, FNP, ordered ████████ ██ ████. On the date of service, ████████ presented for follow-up care for ██████████. **Attachment E,** ████████████. Assessing the wound, Ms. McCain noted that there ████████████████. *Id*. Ms. McCain ordered ███████████ ████████████ *Id*. This debridement resulted in a qualifying non-healing wound pursuant to the coverage requirements in LCD L33831.

Ms. McCain then ordered t████████████████████. This SWO set forth (1) the beneficiary's name (████████), (2) order date (████████), (3) general description of items, (4) quantity to be dispensed, (5) the practitioner's name (Stephanie McCain), and (6) included the practitioner's signature. **Attachment E,** ████████. For items (3) and (4) specifically, this order included two wound coverings: ████████████ █████████████████████████████████████ █████████████████████████████████████ ████████████████████████████████. The supplies were reasonable and necessary pursuant to LCD L33831 given ████████ ██████████████, and the appropriate number of dressings were ordered. The documentation also reflects all three items shipped through third party delivery (Cardinal Health at-Home) and proof of delivery on ████████, via FedEx directly to the beneficiary. **Attachment E,** ████████████. The supplies were properly documented on the HCFA 1500 claim form and the appropriate modifier (A1) was used since the dressings applied to only one wound.[7] **Attachment E,** ████████.

**Claim No. ████████0000**

On ████████, Audra Lewis, NP ordered ████████████ ██. On the date of service, ████████ presented with a non-healing and ████████. **Attachment E,** ████████████. Ms. Lewis assessed the wound and noted that there was a ████████████. *Id*. Ms. Lewis ordered █ ██████████████████████████ ██████████████████████████ ████████████ This debridement resulted in a qualifying non-healing wound pursuant to the coverage requirements in LCD L33831.

Ms. Lewis then ordered the requisite surgical dressings to treat the wound via a SWO. This SWO set forth (1) the beneficiary's name (████████), (2) order date (████████), (3) general description of items, (4) quantity to be dispensed, (5) the practitioner's name (Audra Lewis), and (6) included the practitioner's signature. **Attachment E,** ████████. For items (3) and (4) specifically, this order included two wound coverings: ████████ ██████████████████████████████

---

[7] *See* LCA A54563.

**Liles Parker PLLC ● 2121 Wisconsin Ave. NW ● Suite 200 ● Washington, DC 20007**

Rebuttal Statement
March 1, 2023
Page 6 of 8

███████████████████████████ Ms. Lewis also ordered ███
███████████████████████████ (███████████). *Id*. The supplies
were reasonable and necessary pursuant to LCD 33831 given ███████████
███████████████. The documentation also reflects all three
items shipped through third party delivery (Cardinal Health at-Home) and proof of delivery on
███████████████, via FedEx directly to the beneficiary. **Attachment E,** ██████████████. The
supplies were properly documented on the HCFA 1500 claim form and the appropriate modifier
(A1) was used since the dressings applied to █████████████.[8] **Attachment E,** ██████████████.

## Claim No. ███████████000

On ████████████████, Angel Vantine, NP ordered ███████████████ ████████. On
this date of service, ████████████ presented with ████████████████████
████████████████. **Attachment E,** ██████████████████. Ms. Vantine noted ████████
███████████████████████████. *Id*. Ms. Vantine ordered a
███████████████████████████████████████████
████████████ ████████████ ███████████. This debridement resulted in a qualifying non-
healing wound pursuant to the coverage requirements in LCD L33831.

Ms. Vantine then ordered the requisite surgical dressings to treat the wound via a SWO.
This SWO set forth (1) the beneficiary's name (███████), (2) order date (███████), (3) general
description of items, (4) quantity to be dispensed, (5) the practitioner's name (Angel Vantine), and
(6) included the practitioner's signature. **Attachment E,** ██████████. For items (3) and (4)
specifically, this order included two wound coverings: ███████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ *Id*. The
supplies were reasonable and necessary pursuant to LCD 33831 given ███████████████
███████████████████████████████████████████d. The
documentation also reflects all four items shipped through third party delivery (Cardinal Health at-
Home) and proof of delivery on ████████████████, via FedEx directly to the beneficiary.
**Attachment E,** ████████████████. The supplies were properly documented and coded on the
HCFA 1500 claim form. ████████████ █████████████, ███████ █████.
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████ ██

## Claim No. ███████████0000

On ████████████, Dr. Danny Silver ordered ███████████████ ████████. On this
date of service, ███████████ presented with ███████████████████████████
██████████████. **Attachment E,** █████████████. Dr. Silver further noted █████████
██████████████ ████████████. *Id*. Dr. Silver ordered ███████████████████

---

[8] *See* LCA A54563.
[9] *See* LCA A52521.

Rebuttal Statement
March 1, 2023
Page 7 of 8

███████████████████████████████      ████████████████████████████████████
██ This debridement resulted in a qualifying non-healing wound pursuant to the coverage requirements in LCD L33831.

Dr. Silver then ordered the requisite surgical dressings to treat the wound via a SWO. This SWO set forth (1) the beneficiary's name (███████), (2) order date (███████), (3) general description of items, (4) quantity to be dispensed, (5) the practitioner's name (Danny Silver), and (6) included the practitioner's signature. **Attachment E,** ██████████. For items (3) and (4) specifically, this order included two wound coverings: ██████████████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ The supplies were reasonable and necessary pursuant to LCD 33831 given ███████████████████████████ The documentation also reflects all three items shipped through third party delivery (Cardinal Health at-Home) and proof of delivery on ████████████, via FedEx directly to the beneficiary. **Attachment E,** ████████████████. The supplies were properly documented on the HCFA 1500 claim form and the appropriate modifier (A1) was used since the dressings applied to ██████████.[10] **Attachment E,** ████████████.

**Claim No.** ██████████7000

On April 23, 2020, Michael King, NP ordered ████████████████ ████████████████. On the date of service, █████████ presented with a ████████████████████████████ ████████████. **Attachment E,** █████████████████, ████████ further noted ████████████ ████████████. *Id.* ████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████. This debridement resulted in a qualifying non-healing wound pursuant to the coverage requirements in LCD L33831.

Mr. King then ordered the requisite surgical dressings to treat the wound via a SWO. This SWO set forth (1) the beneficiary's name (██████████████), (2) order date (███████████), (3) general description of items, (4) quantity to be dispensed, (5) the practitioner's name (Michael King), and (6) included the practitioner's signature. **Attachment E,** █████████████. For items (3) and (4) specifically, the order included two wound coverings: ███████████████████

████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████ The supplies were reasonable and necessary pursuant to LCD 33831 given ███████████████████████ █████████████████████. The documentation also reflects all three items shipped through third party delivery (Cardinal Health at-Home) and proof of delivery on █████████ ███, via FedEx directly to the beneficiary. **Attachment E,** ████████████████████. The supplies were properly documented on the HCFA 1500 claim form, and the appropriate modifier (A1) was used since the dressings applied to only one wound.[11] **Attachment E,** ████████████████.

---

[10] *See* LCA A54563.
[11] *See* LCA A54563.

Rebuttal Statement
March 1, 2023
Page 8 of 8

**c.** **Curitec HQ's Documentation was Sufficient to Support the Services Rendered Exclusive of a Captive Audience.**

Qlarant indicates that Curitec HQ engaged in captive audience billing. However, Qlarant did not provide the underlying data or an explanation. Curitec HQ requested this information under a FOIA request dated February 10, 2023, and reiterates its request for prompt transmission of this information.

Curitec HQ is simply a DME supplier engaged in fulfilling orders that are delivered to patients via an acceptable method.[12] Curitec HQ drop ships all orders through Cardinal Health at Home, which is integrated with its Home Medical Equipment (HME)/DME software to ensure that the appropriate items are shipped and billed. As noted *supra*, Curitec HQ supplied surgical dressings for wound care that was medically reasonable and necessary and in response to a qualifying wound. Patients that reside in nursing homes tend to be less mobile, which can result in ulcers, much like the ulcers discussed above in the five sample claims. The mere fact that these patients resided in nursing homes does not disqualify their wounds or mean that the DMEPOS items supplied were not medically reasonable and necessary or otherwise did not meet the coverage requirements.

## III.   Conclusion:

As shown above, each of the five sample claims cited by Qlarant qualify for coverage and payment. Qlarant's assertions that the services were not medically necessary, that the wound was not a "qualifying wound," **_OR_** that that documentation submitted was insufficient are completely without merit.

Based on the facts and the evidence in this case, Curitec HQ respectfully requests that CMS immediately lift the suspension of its Medicare payments and otherwise provide the immediate resumption of payments in light of the information provided in this rebuttal statement and the accompanying attachments and that it acts with urgency in light of the adverse impact on Medicare beneficiaries and Curitec.  Absent immediate payment resumption, Curitec will be compelled to seek emergency judicial intervention

Should additional information be needed, please feel free to contact the undersigned attorney at (202) 298-8750.

Respectfully Submitted,

Ashley Morgan
**Ashley Morgan**
**LILES PARKER PLLC**
**Counsel for Curitec, LLC d/b/a Curitec HQ**

Encl. Attachments A-F

---

[12] As noted *supra*, an acceptable method of delivery is to deliver DME supplies to a nursing facility on behalf of a beneficiary.

**Attachment A**

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form CMS-1696 Approved
OMB No. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

| Name of Party | Medicare Number (beneficiary as party) or National Provider Identifier (provider or supplier as party) |
|---|---|
| **Curitec, LLC, dba Curitec HQ** | ███████████████ |

### Section 1: Appointment of Representative

**To be completed by the party seeking representation (i.e., the Medicare beneficiary, the provider or the supplier):**

I appoint the individual named in Section 2 to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my claim, appeal, grievance or request wholly in my stead. I understand that personal medical information related to my request may be disclosed to the representative indicated below.

| Signature of Party Seeking Representation | Date 02/10/23 |
|---|---|
| Street Address 24 Waterway Avenue, Ste. 755 | Phone Number (with Area Code) 832-662-4325 |

| City The Woodlands | State TX | Zip Code 77380 |
|---|---|---|

| Email Address (optional) nick.percival@Curitec.com | Fax Number (optional) 949-767-5841 |
|---|---|

### Section 2: Acceptance of Appointment

**To be completed by the representative:**

I, Ashley Morgan and Robert Saltafor , hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services (HHS); that I am not, as a current or former employee of the United States, disqualified from acting as the party's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a / an  Attorneys with Liles Parker PLLC
_____
(Professional status or relationship to the party, e.g. attorney, relative, etc.)

| Signature of Representative *Ashley Morgan* *Robert Saltaformaggio* | Date 02/09/2023 |
|---|---|
| Street Address 2121 Wisconsin Ave NW, Suite 200 | Phone Number (with Area Code) 202-298-8750 |

| City Washington | State DC | Zip Code 20007 |
|---|---|---|

| Email Address (optional) | Fax Number (optional) |
|---|---|

### Section 3: Waiver of Fee for Representation

**Instructions: This section must be completed if the representative is required to, or chooses to, waive their fee for representation.** (Note that providers or suppliers that are representing a beneficiary and furnished the items or services may not charge a fee for representation and **must** complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of HHS.

| Signature | Date |
|---|---|

### Section 4: Waiver of Payment for Items or Services at Issue

**Instructions: Providers or suppliers serving as a representative for a beneficiary to whom they provided items or services must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act.** (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, or could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for the items or services at issue in this appeal if a determination of liability under §1879(a)(2) of the Act is at issue.

| Signature | Date |
|---|---|

1

**Attachment A**

# INSTRUCTIONS AND REGULATION REQUIREMENTS

**Instructions**

Name of Party (required): This is the name of the person or entity which has standing to file a claim or appeal (the name of the person who has Medicare, or the name of the provider or supplier).

Medicare Number or National Provider Identifier (required): This must be completed when the person or entity appointing a representative has a Medicare number or National Provider Identifier. If not applicable, fill in, "not applicable".

All fields in Sections 1 and 2 are required unless noted as optional within the field. See the regulation at 42 CFR 405.910.

## Charging of Fees for Representing Beneficiaries before the Secretary of HHS

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Secretary of HHS (i.e., an Administrative Law Judge (ALJ) hearing or attorney adjudicator review by the Office of Medicare Hearings and Appeals (OMHA), Medicare Appeals Council review, or a proceeding before OMHA or the Medicare Appeals Council as a result of a remand from federal district court) is required to obtain approval of the fee in accordance with 42 CFR 405.910(f).

The form, OMHA-118, "Petition to Obtain Approval of a Fee for Representing a Beneficiary" elicits the information required for a fee petition. It should be completed by the representative and filed with the request for ALJ hearing, OMHA review, or request for Medicare Appeals Council review. Approval of a representative's fee is not required if: (1) the appellant being represented is a provider or supplier; (2) the fee is for services rendered in an official capacity such as that of legal guardian, committee, or similar court appointed representative and the court has approved the fee in question; (3) the fee is for representation of a beneficiary in a proceeding in federal district court; or (4) the fee is for representation of a beneficiary in a redetermination or reconsideration. If the representative wishes to waive a fee, he or she may do so. The form, OMHA-118, may be found at: https://www.hhs.gov/sites/default/files/OMHA-118.pdf

## Approval of Fee

The requirement for the approval of fees ensures that a representative will receive fair value for the services performed before HHS on behalf of a beneficiary, and provides the beneficiary with a measure of security that the fees are determined to be reasonable. In approving a requested fee, OMHA or Medicare Appeals Council will consider the nature and type of services rendered, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

## Conflict of Interest

Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before HHS.

## Where to Send This Form

Send this form to the same location where you are sending (or have already sent) your: appeal if you are filing an appeal, grievance or complaint if you are filing a grievance or complaint, or an initial determination or decision if you are requesting an initial determination or decision. If additional help is needed, contact 1-800-MEDICARE (1-800-633-4227, TTY users call 1-877-486-2048), or your Medicare plan.

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you feel you've been discriminated against. Visit https://www.medicare.gov/about-us/accessibility-nondiscrimination-notice, or call 1-800-MEDICARE (1-800-633-4227) for more information. TTY users can call 1-877-486-2048.

---

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950. The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.

**Attachment B**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

February 8, 2023

Curitec, LLC, dba Curitec HQ
24 Waterway Avenue, Ste. 755
The Woodlands, Texas 77380

Re:    **Notice of Suspension of Medicare Payments**
        **Provider/Supplier Medicare ID Number(s):** ▮▮▮▮▮
        **Provider/Supplier NPI:** ▮▮▮▮▮▮
        **Record Identifier:** ▮▮▮▮▮▮



Dear Curitec, LLC, dba Curitec HQ:

The purpose of this letter is to notify you of our determination to suspend your Medicare payments pursuant to 42 C.F.R. § 405.371(a)(2). The suspension of your Medicare payments took effect on February 7, 2023. Prior notice of this suspension was not provided, because giving prior notice would place additional Medicare funds at risk and hinder our ability to recover any determined overpayment. *See* 42 C.F.R. § 405.372(a)(3)and (4).

The Centers for Medicare & Medicaid Services (CMS) through its Central Office made the decision to suspend your Medicare payments. *See* 42 C.F.R. § 405.372(a)(4)(iii). This suspension is based on credible allegations of fraud. *See* 42 C.F.R. § 405.371(a)(2). CMS regulations define credible allegations of fraud as an allegation from any source including, but not limited to, fraud hotline complaints, claims data mining, patterns identified through audits, civil false claims cases, and law enforcement investigations. *See* 42 C.F.R. § 405.370(a). Allegations are considered credible when they have indicia of reliability. *See* 42 C.F.R. § 405.370. This suspension may last until resolution of the investigation as defined under 42 C.F.R. § 405.370 and may be extended under certain circumstances. *See* 42 C.F.R. § 405.372(d)(3)

Specifically, the suspension of your Medicare payments is based on, but not limited to, information that you misrepresented services billed to the Medicare program. More particularly, Curitec HQ billed for services that were not rendered or not rendered as billed, and captive audience billing (rendering supplies to beneficiaries in the same location such as a nursing facility). The following list of sample claims provide evidence of our findings and serve as a basis for the determination to suspend your Medicare payments:

| Claim Control Number (CCN) | Basis for Selected Claims | Date(s) of Service | Amount Paid |
|---|---|---|---|
| ▮▮▮▮0000 | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 12/21/2020 | $817.19 |
| ▮▮▮▮0000 | The documentation did not support that the | 01/22/2020 | $427.87 |



# Qlarant    14643 Dallas Parkway, Suite 400  •  Dallas, Texas 75254-1613  •  www.qlarant.com

**Attachment B**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

| | | wounds met the criteria for a qualifying wound as per Local Coverage Article. | | |
|---|---|---|---|---|
| ██████6000 | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 02/12/2020 | $651.08 |
| ██████0000 | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 01/03/2020 | $2,167.96 |
| ██████7000 | The documentation did not support that the wounds met the criteria for a qualifying wound as per Local Coverage Article. | 04/24/2020 | $696.14 |

This list is not exhaustive or complete in any sense, as the investigation into this matter is continuing. The information is provided by way of example in order to furnish you with adequate notice of the basis for this payment suspension noticed herein.

Pursuant to 42 C.F.R. § 405.372(b)(2), you have the right to submit a rebuttal statement in writing to us indicating why you believe the suspension should be removed. If you opt to do so, we request that you submit this rebuttal statement to us within 15 days of receipt of this notice, and you may include with this statement any evidence you believe supports your reasons why the suspension should be removed. If you choose to submit a rebuttal statement, your rebuttal statement and any pertinent evidence should be sent to:

Qlarant Integrity Solutions, LLC
Attn: Rebuttal and Suspension Department
14643 Dallas Parkway, Suite 400
Dallas, TX 75254

If you submit a rebuttal statement, we will review that statement (and any supporting documentation) along with other materials associated with the case. Based on a careful review of the information you submit and all other relevant information known to us, we will determine whether the suspension should be removed, or should remain in effect within 15 days of receipt of the complete rebuttal package, consistent with 42 C.F.R. § 405.375. However, the suspension of your Medicare funds will continue while your rebuttal package is being reviewed. *See* 42 C.F.R. § 405.375(a). Thereafter, we will notify you in writing of our determination to continue or remove the suspension and provide specific findings on the conditions upon which the suspension may be continued or removed, as well as an explanatory statement of the determination. *See* 42 C.F.R. § 405.375(b)(2). This determination is not an initial determination and is not appealable. *See* 42 C.F.R. § 405.375(c).

If the suspension is continued, we will review additional evidence during the suspension period to determine whether claims are payable and/or whether an overpayment exists and, if so, the amount of the overpayment. *See* 42 C.F.R. § 405.372(c). We may need to contact you with specific requests for further information. You will be informed of developments and will be promptly notified of any overpayment determination(s). Claims will continue to be processed during the suspension period, and

**Attachment B**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

you will be notified about bill/claim determinations, including appeal rights regarding any bills/claims that are denied. The payment suspension also applies to claims in process.

In the event that an overpayment is determined and it is determined that a recoupment of payments under 42 C.F.R. § 405.371(a)(3) should be put into effect, you will receive a separate written notice of the intention to recoup and the reasons. Please be advised that CMS may charge interest on the amount of the overpayment, consistent with 42 C.F.R. § 405.378. In the written notice alerting you to the overpayment, you will be given an opportunity for rebuttal in accordance with 42 C.F.R. § 405.374 from CGS Administrators. When the payment suspension has been removed, any money withheld as a result of the payment suspension shall be applied first to reduce or eliminate any determined overpayment by CMS or the Medicare Administrative Contractor (MAC) including any interest assessed under 42 C.F.R. § 405.378, and then to reduce any other obligation to CMS or to the U.S. Department of Health and Human Services (HHS) in accordance with 42 C.F.R. § 405.372(e). In the absence of a legal requirement that the excess be paid to another entity, the excess will be released to you.

Finally, Qlarant, a CMS Unified Program Integrity Contractor (UPIC), has initiated a process to review your Medicare claims and supporting documentation prior to payment. The purpose of implementing this prepayment process is to ensure that all payments made by the Medicare program are appropriate and consistent with Medicare rules, regulations and policy. The prepayment process is often applied to safeguard Medicare from unnecessary expenditures and to ensure that Medicare payments are made for items and services which are "reasonable and necessary" for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member. *See* 42 U.S.C. § 1395y(a)(1)(A). Notification is hereby given that you are expected to comply with the prepayment process for claims for all dates and services.

Should you have any questions regarding the status of the suspension, please direct your inquiry to **ProviderSuspensionSW@Qlarant.com**. Any request to remove the suspension must be submitted through the rebuttal process described above.

Sincerely,

UPIC South Western Administration
Qlarant Integrity Solutions, LLC

cc: Centers for Medicare & Medicaid Services



**Attachment C**

| | |
|---|---|
| **From:** | Allison Burd |
| **To:** | Ashley Morgan |
| **Cc:** | Robert Saltaformaggio |
| **Subject:** | RE: Availability for a Call - Curitec |
| **Date:** | Friday, February 17, 2023 3:05:05 PM |

> CAUTION: This email originated from outside of Organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi, Ashley,

CMS approved your request for a 15-day extension to submit a rebuttal on behalf of Curitec, LLC. The rebuttal is now due on or before March 9, 2023.

Hope you have a good weekend.

Allison

---

**From:** Ashley Morgan <AMorgan@LilesParker.com>
**Sent:** Friday, February 17, 2023 9:46 AM
**To:** Allison Burd <aburd@chaseconsulting.net>
**Cc:** Robert Saltaformaggio <rsalt@LilesParker.com>
**Subject:** Availability for a Call - Curitec

Hi Allison,

I hope your day is off to a good start. I wanted to see if you had any time for a brief call today regarding the suspension notice issued to Curitec, LLC. I also wanted to request a 15-day extension to file the rebuttal.

Thank you,
Ashley

Ashley H. Morgan
Partner
Liles Parker PLLC
2121 Wisconsin Ave. NW, Suite 200 | Washington, DC 20007
Direct: (202) 750-4420
Office: (202) 298-8750
Fax: (210) 745-4645

The information contained in this email may be confidential and/or legally privileged. It has been sent for the sole use of the intended recipient(s). If the reader of this message is not an intended recipient, you are hereby notified that any unauthorized review, use, disclosure, dissemination, distribution, or copying of this communication, or any of its contents, is strictly prohibited. If you have received this communication in error, please reply to the sender and destroy all copies of the message. Thank you.

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

Delivery Method: Federal Express

July 18, 2022

Curitec, LLC, dba Curitec HQ
24 Waterway Avenue, Ste. 755
The Woodlands, Texas 77380

Re: Medical Review Records Request
Supplier Number: PIN – 7718580001 / NPI – 1710452701
Internal Tracking Number: CSE-220324-00011/MR

Dear Curitec, LLC, dba Curitec HQ:

This letter is to inform you that Qlarant Integrity Solutions, LLC ("Qlarant") will be conducting a review of selected claims you have submitted to Medicare and/or Medicaid. In order to fulfill its contractual obligation with the Centers for Medicare & Medicaid Services (CMS), Qlarant, the Unified Program Integrity Contractor (UPIC) for the South Western Jurisdiction (Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, and Texas), performs medical review for program integrity. As a UPIC, Qlarant is authorized by CMS to review any service provided in the South Western Jurisdiction and billed to Medicare or Medicaid.

We understand that our request for documentation, including patient records, may raise questions about the disclosure of protected health information. The Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule (45 CFR § 164.501-512) permits disclosure of protected health information without beneficiary authorization to carry out treatment, payment or health care operations. When Medicare beneficiaries enroll in the program, they are informed of Medicare's use of their protected health information to carry out health care operations, and the same is true for Medicaid beneficiaries enrolling in Medicaid. Unified Program Integrity Contractors, including Qlarant, perform health care operations as business associates of CMS with respect to the HIPAA Privacy Rule. Providing the requested documentation does not violate the minimum necessary provision of the HIPAA Privacy Rule and does not require beneficiary authorization.

Qlarant is authorized to reopen claims due to the rules cited in 42 CFR § 405.986. Good cause for reopening may be established when new and material evidence was not available or known at the time of the original determination or decision and may result in a different conclusion, or the evidence that was considered in making the determination or decision clearly shows on its face that an obvious error was made at the time of the determination or decision.



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

For this review we have chosen specific claims from the universe of your claims. Included in the universe were only those beneficiaries for whom you were paid by Medicare or Medicaid. The chosen claims were selected from a set of claims that met specific criteria.

The attachment contains the list of beneficiaries and corresponding dates of service for which we are requesting medical records. Please provide us with the applicable medical records for each beneficiary on the attached list. To assist with processing of these medical records, please do not submit double sided copies, stapled or bound records.

The provider agreement to participate in the Medicare and/or Medicaid program requires you to submit all information necessary to support your claims for service. In this respect, if certain records supporting the services rendered are at another facility, as the billing provider you are responsible for obtaining those records for our review.

**Description of documentation requested:**

NOTE: The records we are requesting include any and all documentation to support the medical necessity of services billed for the specified dates of service on the attached list.

- Signed delivery slip(s).
- Signed pick up slip(s).
- Assignment of benefits.
- Physician order(s).
- Face to face evaluation.
- Therapy notes.
- Wound care assessment.
- Assessment notes.
- Correspondence to or from beneficiary.
- Photograph and/or detailed description of service.
- Servicing/repair records.
- Rent/purchase option.
- Supplier patient information forms.
- Detailed patient progress notes from the referring physician justifying the medical necessity for the durable medical equipment billed.
- Prior Authorization documents (if applicable).
- Advanced Beneficiary Notice (ABN) of non-covered services (if applicable).



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

Failure to provide the requested documentation will result in a determination that an overpayment has been made. A referral will be made to the Supplier Audit and Compliance Unit with the National Supplier Clearinghouse for failing to meet Standard 21:

> *42 CFR § 424.57, Standard 21: A supplier must agree to furnish CMS any information required by the Medicare statute and regulations.*

Non-compliance with this standard could result in your supplier/NPI number being inactivated or revoked.

The requested documentation should be submitted to the address below within 30 days of the date on this letter.

Requested information may be sent to Qlarant Integrity Solutions, LLC electronically (preferred) by esMD, Qlarant Secured Portal, or Mail (no drop off or hand deliveries).

- **ESMD:** Qlarant Integrity Solutions, LLC accepts requested documentation from providers via electronic submission of medical documentation by the esMD mechanism. Include a copy of this letter on the front of the requested documentation and submit via esMD. For more information about esMD, refer to www.CMS.gov/esMD
- **Qlarant Secured Portal:** If you prefer to submit records electronically and do not use esMD, you may contact us at 972-383-0000 and provide a contact person and email address. We will send them a link to a secure portal to upload records.

- **Mail:** Attach a copy of this letter to the front of the requested documentation and send by mail via hardcopy or password protected CD Send the password for the CD separately to ensure compliance with HIPAA regulations to:

  **Qlarant Integrity Solutions, LLC**
  **Attention: Medical Review Manager**
  **14643 Dallas Parkway Suite 400 Dallas,**
  **TX 75254**

**PLEASE NOTE THE FOLLOWING:**
**Please do not use a thumb drive, we cannot access information on a thumb drive.** We **cannot** accept this documentation by email. There are no exceptions. You must not send Protected Healthcare Information (PHI) by email because it would be in violation of federal HIPAA statutes.

If the requested documentation is not received within 30 days, the service(s) will be considered nonverifiable, which may result in:

- A determination that an overpayment has been made.



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

- Any overpayment identified in a Statistically Valid Random Sample (SVRS) may be projected to the universe of claims processed during the time frame described above.
- A request for suspension of your Medicare payments in accordance with 42 C.F.R. § 405.371(a)(1).
- Revocation: Failure to comply with this medical records request could lead to revocation under 42 C.F.R. § 424.535(a)(10).
- A decision being made by the Office of Inspector General, DHHS, to exclude you and/or your organization from Medicare, Medicaid and all Federal health care programs in accordance with § 1128(b) (11) of the Social Security Act.

**Authorization for the release of the requested documentation is included in Sections 1815(a), 1833(e), and 1893 of the Social Security Act [42 U.S.C. 1395ddd], Item 6 of the Form CMS-1491 (SC) (01-89), and Item 12 of the Form CMS-1500 (12-90).**

Our clinical staff will review the documentation you submit for each of the claims, to determine if the services billed are reasonable and necessary in accordance with Section 1862(a)(1)(A) of the Social Security Act and meet all other requirements for Medicare and/or Medicaid coverage. Along with our claims payment determination, we will make a determination of liability decision for services that are subject to the provisions of § 1879 of the Social Security Act ("the Act") and a determination in accordance with § 1870 of the Act (as to whether you are without fault for any overpayments).

You will be informed of the review results in our Medical Review Findings Letter. We will include a list of all claims reviewed, and the specific reasons for any denial or re-coding of the claims. You will be provided with an explanation of how any overpayment amount was determined, the reason you are responsible for the incorrect payment, and the amount of the overpayment.

Thank you for your cooperation. If you have any questions I may be reached at (972) 383-0000, Monday through Friday, 8 a.m. to 4 p.m. CT.

Sincerely,

RN, BSN, CCA

Kelli Gannaway RN, BSN, CCA
Assistant Medical Review Manager



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

Enclosure: Beneficiary list
Sample for Curitec, LLC, dba Curitec HQ - NPI 1710452701

cc: File

OMB#0938-0969



14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com

**Attachment D**



Unified Program Integrity Contractor
South Western Jurisdiction (UPICSW)

# Instructions for returning requested records

**First and preferred option:**
- **Qlarant Secured Portal**: You may call (972)-383-0000 and provide a contact person name and email address to request a secured portal link. A Qlarant representative will send you a link to the secure portal with instructions on how to upload records.

**Second option:**
- **esMD:** Qlarant Integrity Solutions, LLC accepts requested documentation from providers via electronic submission of medical documentation by the esMD mechanism. Include a copy of this letter on the front of the requested documentation and submit via esMD. For more information about esMD, refer to www.CMS.gov/esMD

**Final option:**
- **Mail:** Attach a copy of the letter to the front of the requested documentation and send by mail via hardcopy or password protected CD. Send the password for the CD separately (or call 972-383-0000 and provide the password) to ensure compliance with HIPAA regulations to:

  **Qlarant Integrity Solutions, LLC**
  **Attention:**
      **Medical Review Manager (Medicare & Medi-Medi Records)**
      **or**
      **Lindsay Wheatley (Medicaid Records)**
  **14643 Dallas Parkway Suite 400**
  **Dallas, TX 75254**

**NEVER:**
- Please do not use a thumb drive
- Please do not submit records by email
- Please do not hand deliver records



*14643 Dallas Parkway, Suite 400 • Dallas, Texas 75254-1613 • www.qlarant.com*

**SUBSEQUENT PAGES REDACTED**